**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **WOLVERINE WORLD WIDE, INC.,** | |
| **Plaintiff,** | **REDACTED VERSION** |
| **v.** | No. 07-274C<br>(Hewitt, E.) |
| **UNITED STATES OF AMERICA,** | Protected Material to be Disclosed Only In Accordance With Court of Federal Claims Protective Order |
| **Defendant.** | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Plaintiff, Wolverine World Wide, Inc. ("Wolverine"), by its undersigned attorneys, hereby replies to defendant's opposition to plaintiff's motion for a temporary restraining order and/or preliminary injunction.[1] As described in some detail hereafter, defendant's submission reveals a serious misunderstanding of the best value procurement process and, upon analysis, only goes to underscore that the Defense Supply Center Philadelphia ("DSCP") has acted in an arbitrary and capricious manner, abusing its discretion and not complying with applicable law. Further, as first revealed in a telephone conference with the Court held May 3, 2007 and as now confirmed in writing, DSCP mismeasured Wolverine's Product Demonstration Models ("PDMs"), an error that led to downgraded scores in the evaluation process, which had a flow

[1] References to defendant's opposition will be cited as "Def. Brf." and references to exhibits filed with defendant's opposition will be cited as "Def. Ex. __." References to plaintiff's initial brief will be cited as "Pl. Brf." and references to exhibits filed with plaintiff's initial brief will be cited as "Pl. Ex. __."



WASH_1873514.1

**REDACTED VERSION**

through effect on Wolverine's overall ranking. Rather than merely correct its errors, however, DSCP has gone further in an effort to pretermit Wolverine's protest by electing to take "corrective action" in the form of making a redetermination of the competitive range, a redetermination in which Wolverine once again is excluded. *See* Def. Ex. 4. Apart from the fact that this redetermination is post-hoc and litigation driven, serious defects in and of themselves, its conclusions are at odds with the very information on which it purports to rely, and it is beset with a number of other deficiencies described hereinafter.

## ADDITIONAL FACTUAL BACKGROUND

The competitive range determination was first made January 16, 2007. Def. Ex. 1, at 1. It covered a total of [redacted] proposals. *Id.* However, [redacted]. Taking the largest CLIN, 0001, which includes both the ACB Tan boot and the ACB Black boot, [redacted]

2 [redacted]

**REDACTED VERSION**

A "revised" competitive range determination was made May 7, 2007, following correction of the boot height measurement error with respect to Wolverine. Def. Ex. 4, at 1. [redacted]

The foregoing overall ratings, however, mask differences between offerors with respect to individual evaluation factors and subfactors. [redacted]

[redacted]

---

3 [redacted]

**REDACTED VERSION**

[redacted]

Turning to the Past Performance/Experience evaluation factor, [redacted] With respect to the Surge and Sustainment Capability evaluation factor, [redacted] As for the Socioeconomic Support evaluation factor, [redacted] Finally, for the JWOD Act Entity Proposal evaluation factor, [redacted]

As the foregoing demonstrates, Wolverine is a highly qualified offeror, oftentimes exceeding its competitors' scores on the technical evaluation factors and subfactors. Why then is Wolverine excluded from the competitive range? [redacted]

---

4 [redacted]

**REDACTED VERSION**

[redacted]

Def. Ex. 1, at 6. Most recently, [redacted], the contracting officer has written:

[redacted]

Def. Ex. 4, at 6.

## ARGUMENT

### DSCP's Revised Competitive Range Determination Only Goes To Underscore Wolverine's Likelihood Of Success On The Merits

**DSCP's revised competitive range determination is a post-hoc rationalization prepared in the heat of litigation.** There can be no doubt that DSCP's revised competitive range determination was sparked by institution of the present case, since it is dated May 7, 2007. This Court looks askance at post hoc rationalizations as a basis for an agency's action and accords such litigation-motivated efforts little if any weight. *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 768 (2006); *Orion International Technologies v. United States*, 60 Fed. Cl. 338, 343 (2004); *Ceres Environmental Services, Inc. v. United States*, 52 Fed. Cl. 23, 31 n.9 (2002). *See also Parker v. Office of Personnel Management*, 974 F.2d 164, 166 (Fed. Cir. 1992). GAO similarly advises that statements and arguments made in response to a protest should be accorded

REDACTED VERSION

less weight than "contemporaneous materials." Judgments made in response to protest contentions "may not represent the fair and considered judgment of the agency, which is a prerequisite of a rational evaluation and source selection process." *Wilson Beret Co.*, B-289685, Apr. 9, 2002, 2002 WL 31742917 at *7 n.4, 2002 CPD ¶ 206, *citing Boeing Sikorsky Aircraft Support*, B-277263.2, B-277263.3, Sept. 29, 1997, 97-2 CPD ¶ 91, at 15. Here the agency's revised competitive range determination is solely in response to the instant action and is intended to minimize the havoc wrought by its initial misevaluation of Wolverine's proposal. Thus, it should be accorded little or no weight.

**DSCP's revised competitive range determination violates Federal Acquisition Regulation ("FAR") § 15.308 which requires that the Source Selection Authority ("SSA") exercise independent judgment and document that exercise.** The Solicitation states that the contracting officer will make a competitive range determination based on technical and business evaluations and will submit that determination to the SSA for approval. Pl. Ex. 1, at 73. *See also* Army FAR Supplement ("AFARS") § 5115.306(c) (requiring that the SSA approve the competitive range determination). Here, the evidence provided by defendant (Def. Ex. 4) points to the fact that the contracting officer prepared the revised competitive range determination, and that his memorandum was agreed to by a Mr. Hutchinson, but was not signed off on by a Mr. Panichelle. Def. Ex. 4, at 8. Whether Mr. Hutchinson and/or Mr. Panichelle constitute the SSA is nowhere indicated in defendant's papers. But assuming that they do, the revised competitive range determination cannot stand for the simple reason that there is no evidence that the SSA exercised independent judgment in accepting the contracting officer's recommendation. The FAR envisions that SSAs will exercise independent judgment and will document that exercise. FAR § 15.308. While the SSA may agree with the reasoning of the contracting officer, it must

**REDACTED VERSION**

provide an independent rationale for that agreement. When the SSA fails to exercise independent judgment and to document that exercise, this Court has granted relief to the protestor. *Information Sciences Corp. v. United States*, 73 Fed. Cl. 70, 119-22 (2006); *IDEA International, Inc. v. United States*, 74 Fed. Cl. 129 (2006). As Messrs. Nash and Cibinic have explained: "The agency isn't buying points, it's buying some difference in performance or in risk of nonperformance. And that's what the source selection decision needs to explain." 17 Nash & Cibic Report, No. 2, ¶ 11 (Feb. 2003). When the SSA is involved at the competitive range determination stage, as is the case here, that independent judgment and explanation must be exercised by the SSA at this juncture as well. It was not so exercised in this instance.

**DSCP's revised competitive range determination is inherently unfair to Wolverine because it was made on the basis of two different sets of information.** Wolverine was notified of its elimination from the competitive range on February 5, 2007. The Solicitation indicates that after the competitive range is set, DSCP will conduct written and/or oral discussions with offerors in the range, and thereafter offerors will submit final proposal revisions or best and final offers. Pl. Ex. 1, at 73. In view of the asserted pendancy of awards, those discussions must already have occurred and final proposal revisions have been received from the offerors in the competitive range. Indeed, defendant acknowledges as much in its brief. Def. Brf., at 27-28. The resulting information, whether acknowledged or not by the contracting officer in the revised competitive range determination, had to have been in the mind of the agency when the revised competitive range determination was made.[5] Wolverine by contrast is still being evaluated on the basis of its intial proposal without discussions or the opportunity for

5 [redacted]

**REDACTED VERSION**

Wolverine to submit final proposal revisions. This is not a level playing field. All offerors are supposed to be evaluated on the same basis. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 826, 828 (2002).

This inequity is made all the worse by the contracting officer's rank speculation as to what discussions with Wolverine on the topic of price would have yielded, had they been held. [redacted] Even these percentage comparisons, while instructive, do not address what should be the focus of consideration. Wolverine does not have to be the lowest priced offeror to demonstrate a chance of contract award in this best value determination. Five contracts are to be awarded, and if Wolverine is placed in the competitive range, there would be at most [redacted] offerors. [redacted] Further, as

**REDACTED VERSION**

pointed out above, there are several respects in which Wolverine's technical proposal was evaluated as superior [redacted]. Yet DSCP utterly has failed to perform a best value analysis sufficient to justify its conclusion to eliminate Wolverine from the competitive range.

**DSCP's revised competitive range determination is not a true best value determination because it is predicated on overall scores.** AFARS § 5115.304(b)(2) provides:

> It is Army policy to establish the absolute minimum number of factors necessary for evaluation of proposals. Source selection factors may be subdivided into subfactors, that, in rare instances, may be further subdivided into elements if needed. *Evaluation factors and, if used, subfactors and elements are the basis for assessing each offeror's ability to meet the Army's needs. They are the uniform baseline against which each offeror's proposal is compared to determine the proposal(s) which represent the best value to the Government.* Factors and Subfactors must be limited to those which (a) are expected to surface real and measurable discriminators between offerors, and (b) have value enough to warrant the payment of a meaningful cost/price premium to obtain the measured discrimination. Evaluation factors, subfactors, and elements:
>
> (i) Must be written in sufficient depth to communicate the measures of merit used to determine how the proposal will be evaluated and rating determined;
>
> (ii) Include only those specific program characteristics that are significant enough to have an impact on the source selection decision, such as those identified through program risk analysis;
>
> (iii) Set forth in Section M of the draft and final RFPs, Evaluation Factors for Award. In addition, the relative importance of all factors, subfactors, and elements shall be specified in Section M of the RFP; and
>
> (iv) Must be qualitative. Numerical weighting (i.e., assigning points or percentages to evaluation factors and subfactors) is not an authorized method of expressing the relative importance of these factors and subfactors. Evaluation factors and subfactors must be definable in readily understood qualitative terms (i.e., adjectival, colors, or other indicators, but not numbers) and represent the key areas of importance to be considered in the source selection

**REDACTED VERSION**

> process. The direction of this subparagraph is *not* waivable, either on an individual or class basis, as an AFARS deviation.

(Emphasis added). The foregoing, particularly the italicized passage, demonstrates that factor and subfactor ratings must lie at the heart of the best value determination. Those ratings, as reviewed in some detail near the beginning of this brief under the heading "Additional Factual Background," indicate a number of instances where Wolverine scored higher than its competitors who are in the competitive range. Yet when DSCP rationalizes the elimination of Wolverine, those ratings are essentially ignored in favor of reliance upon the overall rating [redacted] Def. Ex. 4, at 6. This conduct conflicts with the AFARS instructions and the core requirements of a best value determination, by failing to account for the comparative differences among the proposals on the factors and subfactors underlying the overall rating [redacted] *See* 17 Nash & Cibic Report, No. 2, ¶ 11 (Feb. 2003).

**DSCP's revised competitive range determination is severely flawed for the reason that it has included in the competitive range an offeror who appears to have closed its operations.** On information and belief, based on published reports, counsel for Wolverine stongly suspect that one of the [redacted] offerors in the competitive range has ceased operations. *See* Pl. Ex. 13, attached. That offeror is [redacted] These accounts go to provide context to DSCP's evaluation of [redacted] surge and sustainment capability [redacted] *See* Def. Ex. 1, at 3; Def. Ex. 4, at 3. Moreover, they may help



WASH_1873514.1

**REDACTED VERSION**

to explain the somewhat curious wording regarding negotiations with [redacted] and the opportunity for [redacted] to increase its technical ratings. Def. Ex. 4, at 7.

Beyond that, however, these accounts throw doubt upon whether [redacted] is a responsible offeror. Contracts are to be awarded only to responsible contractors. 10 U.S.C. § 2305(b)(3). The FAR is quite specific regarding the standards for prospective contractor responsibility. *See* FAR §§ 9.104-1, 9.104-3. [redacted] ability to satisfy these standards is doubtful if the company is closed. Further, the agency determination of responsibility is of an ongoing nature. FAR § 9.105-1 specifies obligations of the contracting officer with respect to obtaining information regarding the responsibility of offerors and at subpart (b)(3) requires that information be obtained or updated on as current a basis as is feasible up to the date of award. A contracting officer's failure to conduct an independent and informed responsibility determination constitutes prejudicial error entitling a competing offeror to relief. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 421, 428 (2002). Moreover, the contracting officer's failure to address [redacted] status in the May 7, 2007 redetermination of the competitive range further illustrates that the redetermination was undertaken solely to contrive a new basis to exclude Wolverine rather than as a thoughtful and rational evaluation of which offerors stood a reasonable chance of award.

**If [redacted] is no longer a viable potential awardee, and Wolverine is excluded from the competitive range, then DSCP has determined a competitive range of [redacted] for the award of five contracts.** Five contracts are to be awarded under the Solicitation at issue, and no offeror is to receive more than one award. In other words there will be five separate awardees. If [redacted] proves to no longer be a viable potential awardee, then the competitive range determined by DSCP will be reduced [redacted]. Consequently, each remaining member of



WASH_1873514.1

**REDACTED VERSION**

the competitive range will be awarded a contract. This will be the equivalent of determining a competitive range of one for award of a single contract. The precedent of this Court is extensive with respect to that occurrence. Judicial scrutiny is close or heightened when the agency proposes to engage in sole source negotiations with a single firm. *See, e.g., Chapman Law Firm v. United States*, 71 Fed. Cl. 124, 132 (2006); *Bean Stuyvesant, LLC v. United States*, 48 Fed. Cl. 303, 339 (2000); *Cubic Defense Systems, Inc. v. United States*, 45 Fed. Cl. 450, 460-61 (1999); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 44 Fed. Cl. 540, 553 (1999); *Pikes Peak Family Housing, LLC v. United States*, 40 Fed. Cl. 673, 678 (1998). Similarly, heightened judicial scrutiny is merited here, and, when applied, Wolverine submits that DSCP's revised competitive range determination cannot pass muster. Given [redacted] questionable status, DSCP's May 7, 2007 redetermination essentially constitutes a source selection decision masquerading as a competitive range determination.

**Summation:** The above discussion demonstrates that DSCP has ignored the evaluation procedures set forth in the solicitation, as well as applicable law and regulations, when making the competitive range determination. When Wolverine first raised this argument in its intial brief, Wolverine was dealing with an overall ranking [redacted] *See* Pl. Brf., at 12-14. Now, after revision, Wolverine overall is ranked [redacted] yet, unlike all other offerors ranked [redacted] Wolverine remains excluded from the competitive range, a range moreover that includes one offeror ranked overall as [redacted][6]

---

[6] In its initial brief, Wolverine also argued that DSCP ignored the subfactor weighting terms of the Solicitation in evaluating Wolverine's PDMs, leading to an incorrect PDM factor evaluation, which in turn led to a flawed overall rating. Pl. Brf., at 14-16. The correctness of that contention now has been verified [redacted]

**REDACTED VERSION**

**DSCP Misevaluation Of Certain PDM and Experience/Past Performance Subfactors Has Been Confirmed And/Or Insufficiently Rebutted**

Initially, Wolverine asserted misevaluation by DSCP of certain PDM and Experience/Past Performance Subfactors, which errors led to incorrect factor evaluations, which in turn led to a flawed overall rating. Pl. Brf., at 16-20. Following defendant's response, the validity of Wolverine's contentions remain largely unrebutted.

**Boot Height**. On information and belief, Wolverine contended that DSCP mismeasured the height of its PDMs. The correctness of that assertion has been confirmed. *See* Def. Ex. 8.

[redacted] Defendant does not contest Wolverine's arguments. Instead, it argues that the Solicitation was patently ambiguous or alternatively, even if not patently ambiguous, that Wolverine's interpretation was unreasonable. Def. Brf., at 21-23. Defendant offers no support through declarations for its contentions. Wolverine's interpretation was reasonable for two reasons. [redacted]

---

[redacted]

**REDACTED VERSION**

[redacted]

**Experience and Delivery Performance:** Wolverine asserted that these subfactors of the Past performance/Experience factor were graded differently than on a contemporaneous proposal submission to DSCP where essentially the same information was provided. Defendant disputes that the same information was supplied, Def. Brf., at 23, but points to no differences between the two proposal submissions. Instead, defendant's argument is that DSCP considered different information. With respect to the experience subfactor, defendant's own documentation does not support its argument. *Compare* Def. Ex. 2, at 8 *with* Def. Ex. 5, at 2. DSCP simply came to inconsistent evaluations. With respect to the delivery performance component of the quality of items/delivery performance subfactor, Wolverine would now agree, on the basis of the documentation supplied, that DSCP considered a greater number of delivery orders when evaluating the second proposal. However, that fact was not made evident during the oral debriefing with respect to the second proposal.

**Defendant Has Not Established That Entry Of A Temporary Restraining Order Or Preliminary Injunction Will Adveresely Impact Military Needs**

Defendant's brief asserts that the "boots are vital to the efforts in Iraq and Afghanistan[,]" Def. Brf., at 26, citing the Declaration of Brigadier General Cross, Def, Ex. 6, at ¶ 4. General Cross's declaration, however, does *not* state that the boots are vital to the efforts in Iraq and Afghanistan, either at paragraph 4 or anywhere else. General Cross merely says that the "attributes of the boot afford the solider (sic) an item of footwear that will provide support and protection commensurate with training and battle in the desert environment." *Id.* at ¶ 4. A review of the balance of the declaration indicates that General Cross makes *no mention whatsoever of Iraq or Afghanistan,* much less that the boots covered by the instant solicitation

**REDACTED VERSION**

are necessary for combat in those areas. Defendant's brief simply misstates General Cross's declaration in a vain effort to persuade the Court that the boots are urgently needed to meet a critical combat need.

Nor does General Cross state that DSCP will not be able to meet its requirements for boots should the award of contracts under the instant solicitation be delayed by entry of a temporary restraining order in this case. General Cross does discuss the current status of DSCP tan and black boot supply, backlogs, projected needs and expiration of current contracts, *id.* at ¶¶ 6, 7, 11, & 12, acknowledges that current contracts remain in place and notes that DSCP's needs are driven in part by end of year fiscal spending, *id.* at ¶¶ 6, 7, hardly the type of urgent need that cries out for judicial solicitude or that warrants denial of a temporary restraining order or preliminary injunction. Dispostively, at *no point* in the declaration does General Cross state that entry of a temporary restraining order in this case, or that a delay in the award of the challenged contracts resulting from a preliminary injunction, will prevent DSCP from adequately addressing its boots requirements. Nor does General Cross state that the incumbent contractors will not or cannot meet DSCP needs through bridge contracts pending the protest. Wolverine specifically has alleged that DSCP can meet its needs by a variety of contract devices, such as bridge contracts with incumbents, *see* Pl. Brf., at 22-23, and General Cross does not say otherwise.

Defendant's brief recites statements from General Cross's declaration largely verbatim, *see* Def. Brf., at 27, and concludes therefrom that "the Army simply will not be able to fill back orders and keep up with continuing demand in the absence of awarding contracts for additional sources of supply for the boots." *Id.* This general conclusion, namely, that the Army cannot meet its needs without awarding contracts, is both self-evident and completely beside the point. It is self-evident that DSCP will have to award additional contracts to meet its boot needs, as

**REDACTED VERSION**

awarding contracts is the way DSCP procures boots. The issue presented here, however, is whether DSCP has an urgent need that can *only* be met by award of contracts under the instant solicitation. This, the government does not say. Indeed, defendant's brief carefully avoids making that claim, cognizant that General Cross's declaration does not support such a position.[7] Again, considering that Wolverine has specifically alleged that DSCP can meet its needs by a variety of contract devices, such as bridge contracts with incumbents, the government's inability to demonstrate to the contrary effectively concedes that entry of a temporary restraining order and/or a preliminary injunction will not harm its military interests.

To be sure, defendant's brief does assert a host of problems it claims could have been avoided had Wolverine protested earlier,[8] Def. Brf., at 28, such as speculating what DSCP might have done. What is most notable about this litany is that *none* of these assertions are supported by a single reference to the record, and in particular, by any reliance upon the declarations of General Cross, or Messrs. Darcy and Meehan. Defendant's position here is merely unsupported speculation that is entitled to no factual weight. Moreover, attributing this litany of problems to a claimed two month delay by Wolverine in filing the protest ignores that DSCP has taken six

---

[7] Defendant makes a similar statement to the effect that "DSCP must be in a position to make awards immediately in order to allow awardees time to gear up production to satisfy back orders and the anticipated surge in demand." Def. Brf., at 28. DSCP can make bridge contracts awards immediately, nothing in this lawsuit seeks to prevent DSCP from doing so, and nothing in the brief claims otherwise. What the government argues is that the time that may be required to award interim contracts may be longer and the cost may be higher. Def. Brf., at 28-29. Notably, these statements are not supported by any citation to the record and hence should be disregarded.

[8] The Court is respectfully referred to the Supplemental Declaration of Ron Woznick, attached hereto, which further explains the considerations behind and the timing of Wolverine's protest.

**REDACTED VERSION**

months, from August 2006 to February 2007, just to make the competitive range determination, and despite passage of another three months still has not awarded the contracts.[9]

## CONCLUSION

For the reasons stated above and those set forth in plaintiff's opening brief, Wolverine World Wide, Inc. respectfully requests that the Court grant its motion for a temporary restraining order and/or a preliminary injuction pending the Court's decision on the merits of Plaintiff's Complaint.

Respectfully submitted,

s/ Philip A. Nacke
Philip A. Nacke
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5143
Telephone 202.295.4086
Facsimile 202.672.5399

*Counsel of Record for Plaintiff Wolverine World Wide, Inc.*

OF COUNSEL:
David T. Ralston, Jr.
Steven C. Lambert
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5143
Telephone 202.672.5300
Facsimile 202.672.5399

Dated May 10, 2007

---

[9] Indeed, all of defendant's assertions are belied by the fact that pre-litigation documentation produced to date does not evince DSCP urgency as to completion of the instant procurement. Besides taking nine months from proposal submission to award, DSCP ranked surge an sustainment capability as only third in priority of the technical evaluation factors, and [redacted] who were scored lower than Wolverine on surge capability, hardly a course of conduct consistent with an urgent need for massive production of boots. *See* Def. Ex. 1, at 3.



WASH_1873514.1