**No. 07-274C (Judge Hewitt, E.)**

---

**IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS**

---

**WOLVERINE WORLD WIDE, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

---

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FORTEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

---

**AGREED UPON REDACTED COPY**

**PETER D. KEISLER**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KATHRYN A. BLEECKER**
**Assistant Director**

**DAVID A. LEVITT**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit, 8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 307-0309**
**Fax: (202) 514-7965**
**E-mail: david.levitt@usdoj.gov**

**May 8, 2007**

**TABLE OF CONTENTS**

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
FORTEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION . . . . . . . . 1

FACTS . . . . . . . . 2

I. The Solicitation . . . . . . . . 2

II. The Competitive Range Determination . . . . . . . . 7

ARGUMENT . . . . . . . . 9

I. Standards For Granting Preliminary Injunction . . . . . . . . 9

II. There Is No Evidence Wolverine Will Suffer Imminent Irreparable Injury If Preliminary Injunctive Relief Is Denied . . . . . . . . 11

III. Wolverine Has Not Demonstrated A Substantial Probability Of Prevailing On The Merits . . . . . . . . 15

A. The Standard For Reviewing Evaluation Factors And Subfactors . . . . . . . . 16

B. Neither The Solicitation Nor FAR Require All Satisfactory Proposals To Be Included In The Competitive Range . . . . . . . . 16

C. Given The Subfactor Ratings For Manufacturing Operations And Visual, The Initial DSCP Review Properly Rated Wolverine's PDM "Satisfactory" . . . . . . . . 18

D. With The Exception Of Mismeasuring The Height Of The PDM, DSCP Correctly Evaluated Woverine's Technical Proposal . . . . . . . . 20

IV. Wolverine Has Not Demonstrated That The Public Interest Or The Relative Equities Favor An Award Of Preliminary Injunctive Relief . . . . . . . . 25

CONCLUSION . . . . . . . . 30

## TABLE OF AUTHORITIES

**CASES:** **PAGES:**

ABF Freight System, Inc. v. United States,
55 Fed. Cl. 392 (2003) . . . . . . . . . . 12, 15

ACRA, Inc. v. United States,
44 Fed. Cl. 288 (1999) . . . . . . . . . . 10

Aero Corp., S.A. v. United States,
38 Fed. Cl. 237 (1997) . . . . . . . . . . 2, 26

Alfa Laval Separation, Inc. v. United States,
175 F.3d 1365, 1367 (Fed. Cir. 1999) . . . . . . . . . . 10

Bannum Inc., v. United States,
56 Fed. Cl. 453 (2003) . . . . . . . . . . 9, 10

Beta Analytics Int'l, Inc. v. United States,
44 Fed. Cl. 131 (1999) . . . . . . . . . . 16

Burroughs Corp. v. United States,
617 F.2d 590 (1980) . . . . . . . . . . 16

Cardinal Maintenance Service, Inc. v. United States,
63 Fed. Cl. 98 (2004) . . . . . . . . . . 26

CACI, Inc.-Federal v. United States,
719 F.2d 1567 (Fed. Cir. 1983) . . . . . . . . . . 9

CCL Service Corp. v. United States,
48 Fed. Cl. 113, 119 (2000) . . . . . . . . . . 16

Citibank, N.A. v. Citytrust,
756 F.2d 273 (2nd Cir. 1985) . . . . . . . . . . 15

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) . . . . . . . . . . 11

Computer Sciences Corp. v. United States,
51 Fed. Cl. 297 (2002) . . . . . . . . . . 2

Crux Computer Corp. v. United States,

24 Cl. Ct. 223, 226 (1991) . . . . . . . . . . 10

CSE Construction Co., Inc. v. United States,
58 Fed. Cl. 230 (2003) . . . . . . . . . . 2

CW Government Travel, Inc. v. United States,
61 Fed. Cl. 559 (2004) . . . . . . . . . . 29

Electro-Methods, Inc. v. United States,
7 Cl. Ct. 755, 762 (1985) . . . . . . . . . . 11

E.W. Bliss Co. v. United States,
77 F.3d 445, 449 (Fed. Cir. 1996) . . . . . . . . . . 16

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) . . . . . . . . . . 9, 14

Fort Vancouver Plywood Co. v. United States,
860 F.2d 409 (Fed. Cir. 1988) . . . . . . . . . . 21, 22

Impresa Construzioni Geom. Domenico Garufi v. United States.,
238 F. 3d 1324 (Fed. Cir. 2001) . . . . . . . . . . 11

Information Sciences Corp. v. United States.,
73 Fed. Cl. 70 (2006) . . . . . . . . . . 12

ITT Federal Services Corp. v. United States,
45 Fed. Cl. 174 (1999) . . . . . . . . . . 22

Magellan Corporation v. United States,
27 Fed. Cl. 446 (1993) . . . . . . . . . . 13

Mazurek v. Armstrong,
520 U.S. 968 (1997) . . . . . . . . . . 10

MCS Management Co., Inc. v. United States,
48 Fed. Cl. 506 (2001) . . . . . . . . . . 10

Newsom v. United States,
676 F.2d 647 (Fed. Cir. 1982) . . . . . . . . . . 21, 22

OAO Corporation v. United States,
49 Fed. Cl. 478 (2001) . . . . . . . . . . passim

Oakland Tribune Inc. v. Chronicle Publ'g Co., Inc.,
762 F.2d 1374 (9th Cir. 1985) . . . . . . . . . . 15

PGBA, LLC v. United States,
60 Fed. Cl. 196 (2004),
aff'd 389 F.3d 1219 (Fed. Cir. 2004) .......... 10

Statistica, Inc. v. Christopher,
102 F.3d 1577, 1582 (Fed. Cir. 1996) .......... 10

Software Testing Solutions, Inc. v. United States,
58 Fed. Cl. 533, 537-38 (2003) .......... passim

W & D Ships Deck Works, Inc. v. United States,
39 Fed. Cl. 638 (1997) .......... 9

**STATUTES:**

28 U.S.C. § 1491(b)(3) .......... 2, 25

28 U.S.C. § 1491(b)(4) .......... 10, 12

**REGULATIONS:**

48 C.F.R. § 15.306(c)(1) .......... 17

48 C.F.R. 6.304 .......... 28

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **WOLVERINE WORLD WIDE, INC.,** Plaintiff, v. **UNITED STATES OF AMERICA,** Defendant. | **PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**<br><br>No. 07-274C<br>(Hewitt, E.) |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Defendant, the United States, submits the following response to Plaintiff's Motion For Temporary Restraining Order And/Or Preliminary Injunction. Plaintiff, Wolverine Worldwide, Inc. ("Wolverine") seeks a temporary restraining order and/or a preliminary injunction enjoining the Defense Supply Center Philadelphia ("DSCP"), the contracting authority, from awarding contracts pursuant to Contract Line Items ("CLINs") 0001, 0002, 0006, 0007, and 0008 of Solicitation SPO100-06-R-0007 until the complaint for permanent injunctive relief is resolved on its merits.

The procurement pertains to hot weather army combat boots which are currently on back order from the Department of the Army. These boots are used by new recruits and military personnel in the field and, as we demonstrate below, failing to permit the agency to award the contracts imminently is likely to result in a shortage of such boots for soldiers in the field contrary to the Tucker Act's admonition that "the courts shall give due regard to the interests of national defense and national security. . . ." 28 U.S.C. § 1491(b)(3); see, e.g., CSE Construction Co., Inc.

v. United States, 58 Fed. Cl. 230, 262 (2003) ("A solicitation that addresses military preparedness implicates interests of national defense, which, thus, becomes a factor the court must consider in the balance of harms"); Computer Sciences Corp. v. United States, 51 Fed. Cl. 297, 323 (2002) (due to the impact on national security, injunctive relief was denied even if plaintiff could have succeeded on the merits); Aero Corp., S.A. v. United States, 38 Fed. Cl. 237, 241-42 (1997) ("The fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance . . . of . . . harms factor on the Defendant's side of the scale").

In the absence of a temporary restraining order or preliminary injunction, DSCP anticipates awarding contracts to fill back orders and provide a continuing supply of hot weather combat boots on or around May 16, 2007. Wolverine contends that DSCP acted arbitrarily and capriciously when it excluded Wolverine from the competitive range, and seeks preliminary and permanent injunctive relief to compel DSCP to revise its evaluations of Wolverine's proposals, include Wolverine in the competitive range, engage in negotiations with Wolverine to enable the submission of a best and final proposal, and consider Wolverine's proposal along with others in the competitive range to determine final contract awards.

As we demonstrate, Wolverine has failed to provide clear and convincing evidence that it is entitled to preliminary injunctive relief. Accordingly, its motion for a temporary restraining order and preliminary injunction should be denied.

## FACTS

### I. The Solicitation

By Solicitation SP0100-06-R-007, issued May 18, 2006, DSCP sought proposals for the

award of five (5) contracts for Army Hot Weather Combat Boots. Complaint, ¶ 6. Amendment 0003, issued July 18, 2006, among other things, extended the date for submission of proposals to August 2, 2006. Id.

Th Solicitation establishes eight CLINs, each of which is for a separate award for a base year and four option years. Complaint, ¶ 7. All of the CLINs call for the production and supply of "Army Combat Boot, Hot Weather," which are tan and are referred to in the Solicitation as "Army Combat Boot, Hot Weather" (hereinafter "ACB Tan"). CLIN 0001, in addition to procuring "ACB Tan," also calls for the production and supply of "Boot, Hot Weather Black" (hereinafter "ACB Black") which is black rather than tan. CLINs 0001 and 0002 are "unrestricted," meaning that the procurement is open to all offerors, irrespective of size. Id. CLINs 0003-0005 are reserved for small business. Id. CLIN 0006 presents the requirements of CLIN 0003 in the event no award is possible under CLIN 0003. Likewise, CLINs 0007 and 0008 present the requirements of CLINs 0004 and 0005 in the event no awards are possible under CLINs 4 and 5. Id. at ¶¶ 7-10.[1]

The Solicitation requires that the offeror submit a "technical proposal [that] must demonstrate the offeror's ability to meet the Government's requirements as set forth in this solicitation." Plaintiff's Appendix In Support Of Motion For TRO And/Or Preliminary Injunction ("Appendix") at 58.[2] The Solicitation sets forth "technical proposal evaluation

---

[1] CLINs 0004 and 0005 have now been "closed out" due to the absence of competitive bids. CLIN 0003 will be awarded to a small business contractor. The remaining CLINs to be awarded are 0001, 0002, 0007, and 0008.

[2] The Administrative Record in this case is not scheduled to be filed until May 15, 2007. In this opposition, we cite to plaintiff's Appendix when materials included in the Appendix are relevant to our opposition. We also include as exhibits to the opposition materials not included

factors." The first such factor is "product demonstration models" ("PDM") which is a model boot that conforms to the specifications in the Solicitation. Appendix at 59. The Solicitation states that the "[f]ailure of models to conform to all . . . characteristics [required by the Solicitation] may require rejection of the offer." Id. The second technical evaluation factor is "past performance/experience," which relates to the offeror's experience on other contracts relating to similar products. Id. at 62. The third technical factor is "surge and sustainment capability" which relates to the offeror's ability to increase the quantities above the maximum limits per delivery period. Id. at 62. The fourth and fifth factors, respectively, are "socioeconomic support" and "Javits-Wagner-O'Day Act Entity Proposal." These relate to the offeror's ability to subcontract work to small businesses and disadvantaged contractors. Id. at 63-65.

DSCP, through its technical experts, evaluates each offeror's PDM, "past performance/experience," "surge and sustainment capability," and ability to subcontract work to small businesses.[3] For purposes of evaluation, the technical factors are broken down into subfactors. The subfactors for the PDM are: "manufacturing operations" which assesses the compliance of the PDM with the product's specifications; "visual requirements" which assesses whether the product's "look" is consistent with the specifications; "dimensional requirements," which assesses whether the sizing is accurate; and "testing requirements," which assesses whether the PDM passes various strength, durability and comfort tests. Appendix at 66. The Solicitation

---

in plaintiff's Appendix which we believe are relevant to the motion. Most or all of our exhibits and the materials in the Appendix will be included in the Administrative Record.

[3] As noted in the Declaration of Thomas Darcy, the designated contracting officer, attached as Exhibit 7, the PDMs are subject to a strict chain of custody and all testing is done without knowledge of the offeror whose boots are being tested. Exhibit 7 at ¶¶ 2-6.

indicates that the PDM subfactors "are of equal importance." Id. However, it also notes that "[a]n "UNACCEPTABLE" rating in Subfactor 1 ["manufacturing operations"] OR Subfactor 2 ["visual requirements"] will be cause for an Overall Unacceptable rating of PDM," thus indicating that the subfactors are not weighted equally in assessing the PDM. Id. at 67.

The subfactors for evaluating "past peformance/experience" are: "experience," which assesses the offeror's past performance on similar contracts; "delivery," which assesses the offeror's success at delivering the same or similar products in prior contracts; "quality of items," which measures the quality of the same or similar products delivered under other contracts; and "compliance with contractual socioeconomic subcontracting goals," which measures the achievement of socioeconomic subcontracting goals under other contracts. Appendix at 61.

For the factors of "PDM," "past performance/experience" and "surge and sustainment capability," and the subfactors under each factor, the Solicitation establishes an "adjective rating symbology" consisting of the following ratings: "exceptional," "very good," "satisfactory," "marginal," and "unsatisfactory." Appendix at 70-72. With respect to the "socioeconomic" and "Javits-Wagner-O'Day Act factors the proposals are ranked numerically (i.e. the ranking of each offeror vis-a-vis the other offerors). Appendix at 72. There are no adjective ratings for these factors.

As applied to the PDM, the "adjective rating symbology" defines "exceptional" as "no deficiencies" from the specifications in the Solicitation; "very good" as meeting the specifications but "contain[ing] a deficiency or deficiencies that are . . . very easily correctable during production;" "satisfactory" as meeting the specifications but containing deficiencies that "require preventative corrective action in production;" and "marginal" and "unsatisfactory" indicating the

offeror "failed to meet many significant design related and/or other requirements [which are ] . . . indicative of a lack of understanding [of] the technical requirements . . . . " Id. at 71.

With respect to "past performance/experience," "exceptional" means the offeror's prior performance on similar contracts "meets contractual requirements and exceeds many requirements to the Government's benefit;" "very good" is defined as the offeror meeting the standards of prior contracts "with some minor problems for which corrective actions . . . were effective;" "satisfactory" as the offeror having prior contracts "meet[ing] contractual requirements" and "includ[ing] some minor problems for which corrective actions . . . appear or were satisfactory;" and "marginal" and "unsatisfactory" as "past performance does not meet some [or most] contractual requirements." Id.

In addition to the factors and subfactors, the evaluators rate the entire proposal based upon the individual factors. An overall rating of "exceptional" "indicates a comprehensive understanding of the technical requirements and an ability to provide an acceptable quality product/service with the highest probability of successful contract performance." Id. at 70. An overall rating of "very good" "indicates an understanding of the technical requirements and an ability to provide an acceptable quality product/service with a very good probability of successful contract performance." Id. An overall rating of "satisfactory" "indicates an understanding of the technical requirements and an ability to provide an acceptable quality product/service with a reasonable probability of successful contract performance." Id. at 70-71. Ratings of "marginal" and "unsatisfactory" indicate an inability to perform the contract. Id.

The Solicitation notes that technical concerns outweigh price in the proposals' evaluations. However, price is relevant to determine the competitiveness of the proposals in the

event of similar technical proficiency. As noted in the Solicitation, "[t]echnical and past performance, when combined, are [s]ignificantly more important than cost or price. As technical and past performance factors become more equal, the evaluated cost or price becomes more important." Id. at 66.

The Solicitation explains how the winning bidders are selected. As noted in the "overview," all proposals "undergo a technical and business [i.e., price] evaluation . . ." after which "the contracting officer . . . make[s] a competitive range determination . . . and submit[s] it to the Source Selection Authority (SSA) for approval." Id. at 73. Thereafter, "unless award is made on the basis of initial proposals, written and/or oral discussions [are] conducted with all offerors in the competitive range . . . [and] final proposal revisions resulting from discussions . . . undergo further technical and business evaluations." Appendix at 73. Unless written proposals are accepted at the outset, therefore, there are discussions and final offers from those within the competitive range who then become eligible for contract awards.

## II. The Competitive Range Determination

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

ARGUMENT

I. Standards For Granting Preliminary Injunction

As the Federal Circuit has noted, the plaintiff is not entitled to preliminary injunctive relief unless it is able to carry the burden of persuasion by a "clear showing" that, in the absence of such relief, it will suffer irreparable harm; that there is a substantial likelihood of success on the merits; that the harm to the plaintiff if the injunction is denied outweighs the harm to the defendant if it is granted; and the public interest. See FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see also, Bannum Inc., v. United States, 56 Fed. Cl. 453, 460-61 (2003), quoting 11A Wright & Miller § 2948; OAO Corporation v. United States, 49 Fed. Cl. 478, 479-81 (2001); W & D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 647 (1997) ("When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction"). Injunctive relief is an extraordinary remedy. CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983). "A temporary restraining order [or a preliminary injunction] is an 'extraordinary and drastic remedy, one that should not be

granted unless the movant, by a clear showing, carries the burden of persuasion." Software Testing Solutions, Inc. v. United States, 58 Fed. Cl. 533, 537-38 (2003), quoting Mazurek v. Armstrong, 520 U.S. 968 (1997).

When an applicant seeks preliminary injunctive relief in a bid protest context, the burden of persuasion is particularly difficult because, as this Court has noted, "the agency action is accorded the deference of review under the standards set forth in the Administrative Procedure Act." Bannum, 56 Fed. Cl. at 456; see 28 U.S.C. § 1491(b)(4).. This deference compels a "stringent application of judicial restraint in the grant of injunctive relief, particularly with respect to the Court's determination of plaintiff's likelihood of success on the merits. OAO Corp., 49 Fed. Cl. at 479; see MCS Management Co., Inc. v. United States, 48 Fed. Cl. 506, 510-511 (2001) (if there is a reasonable basis for the agency's decision, the Court must uphold the agency's decision); Crux Computer Corp. v. United States, 24 Cl. Ct. 223, 226 (1991) (a reasonable basis for the agency's decision "requires a rational connection between the facts of the situation and the decision made").

Further, "to prevail in a bid protest, a disappointed offeror must show both significant error in the procurement process and prejudice to its posture in the process." PGBA, LLC v. United States, 60 Fed. Cl. 196, 203 (2004), aff'd 389 F.3d 1219 (Fed. Cir. 2004). In order to establish "prejudice" in the bid protest context, "the protester must show 'that there was a substantial chance it would have received the contract award but for the error.'" Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999), quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996); see also ACRA, Inc. v. United States, 44 Fed. Cl. 288 (1999). In order to demonstrate a material error, the protestor must show the agency

failed to apply the procurement regulations correctly or failed to articulate a rational basis for its judgments. See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413-16 (1971); Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985). The Court of Appeals for the Federal Circuit has articulated the appropriate standard of review:

> Under the APA standards that are applied in the Scanwell line of cases, a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," id. and the "disappointed bidder bears a 'heavy burden" of showing that the award decision "had no rational basis." When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations."

Impresa Construzioni Geom. Domenico Garufi v. United States,, 238 F. 3d 1324, 1332-33 (Fed. Cir. 2001) (citations omitted).

As we demonstrate, Wolverine is unable to carry the burden of persuasion demonstrating that it is entitled to an award of preliminary injunctive relief. Accordingly, its motion should be denied.

## II. There Is No Evidence Wolverine Will Suffer Imminent Irreparable Injury If Preliminary Injunctive Relief Is Denied

Wolverine contends that, in the absence of preliminary injunctive relief, DSCP is likely to

award contracts in the near future and this constitutes imminent irreparable injury because it will be in a less favorable litigating posture to obtain injunctive relief after the award than before, it will be deprived of its right to compete prior to the award, and it will be deprived of profits it might have made if it had been able to compete in the procurement. Motion For Temporary Restraining Order And/Or Preliminary Injunction ("Motion") at 20-22. Even assuming DSCP issues awards prior to the time Wolverine is able to receive a decision on the merits of its complaint, however, this does not mean Wolverine is subject to imminent irreparable injury if its motion is denied.

As this Court has noted, "[t]he Tucker Act provides that the Court of Federal Claims 'shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." ABF Freight System, Inc. v. United States, 55 Fed. Cl. 392, 396 (2003). Therefore, the Tucker Act's waiver of sovereign immunity extends to agency actions taken before award or after award of the contract. Further, as in a pre-award context, in a post-award context "'courts shall review the agency's decision pursuant to the standards set forth in section 706 of Title 5.'" Id.,quoting 28 U.S.C. § 1491(b)(4). In extremely limited circumstances, in both post-award and pre-award contexts, this Court is empowered to intervene to prevent injustice. See, e.g., Information Sciences Corp. v. U.S., 73 Fed. Cl. 70 (2006) (court vacated bid award and ordered new procurement). As this Court has noted, the alleged loss of the opportunity to compete prior to award does not give rise to imminent irreparable harm because "one of the remedies . . . is cancellation of the entire procurement, even after award to

some other supplier . . . and its very potentiality discounts the harm to plaintiff." See Magellan Corporation v. United States, 27 Fed. Cl. 446, 447 (1993). Therefore, the imminence of an award in the absence of preliminary injunctive relief is not "irreparable injury."

Wolverine's other claims of "irreparable injury" stem from the allegation that, in the absence of immediate relief, it will be deprived of the opportunity to compete in a fair procurement process and will forfeit the profit it would have made if it had competed and been awarded the contract. Motion at 20-22. With respect to the allegation concerning the denial of a fair procurement process, as this Court has noted, this does not constitute "irreparable injury" in the absence of evidence that the claimant was deprived of an opportunity to compete. See, e.g., OAO Corp., 49 Fed. Cl. at 480-81. As in this case, in OAO Corp., the claimant alleged that its proposal had been unfairly evaluated and sought a preliminary injunction. As to the claim that irreparable injury stemmed from the lack of a fair evaluation process, the Court observed that, because "it is not clear that plaintiff was denied the opportunity to compete in a fair bidding process," Id., there was no showing of irreparable injury from the evaluation of its proposal. As we demonstrate in our discussion of the probability of prevailing of the merits, in this case as well "it is not clear that plaintiff was denied the opportunity to compete in a fair bidding process . . . . " Id. Accordingly, this alleged defect does not present "irreparable injury."

As for potential lost profits, Wolverine assumes that because lost profits are not recoverable under the Tucker Act, a plaintiff is irreparably injured if it is deprived of an opportunity to earn profits as a result of a faulty competitive process. Motion at 22. However, Wolverine is a billion dollar plus company, Appendix at 164, and there is no showing it lacks the ability to substitute other business opportunities for those represented by the contested

procurement. See OAO Corp., 49 Fed. Cl. at 480-81 (even though "losses may be substantial, they are not irreparable"). Further, in assessing the lost profits claim, it is necessary to determine whether Wolverine would likely win the procurement, and therefore be deprived of "lost profits" in the absence of an opportunity to compete. See, e.g., FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993) ("[n]o one factor, taken individually, is necessarily dispositive [of whether preliminary injunctive relief is warranted]"). [redacted] Accordingly, the assumption that Wolverine would win a "fair" procurement, and therefore suffers "irreparable injury" from lost profits in the absence of preliminary injunctive relief, fails to square with the relevant facts.

Finally, Wolverine's actions with respect to the procurement demonstrate that it did not regard failing to be included in the competitive range "irreparable injury." [redacted] Had it considered the exclusion from the competitive range to be "irreparable injury," it would have availed itself of other remedies such as appealing within the agency or to the General Accountability Office ("GAO"), either of which actions would have placed the procurement on "hold." See, e.g., 4 C.F.R. § 21.2. [redacted] Pursuing either of these alternatives may have indicated "imminent

harm," but not doing them suggests the contrary. See, e.g., Software Testing Solutions, 58 Fed. Cl. at 537 ("'failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact no irreparable injury,'" quoting Citibank, N.A. v. Citytrust, 756 F.2d 273, 277 (2nd Cir. 1985)); Oakland Tribune Inc. v. Chronicle Publ'g Co., Inc., 762 F.2d 1374, 1377 (9th Cir. 1985) (finding that delay in requesting a preliminary injunction "implies a lack of urgency and irreparable harm"); ABF Freight Systems, 55 Fed. Cl. at 399-401 (the complaint was untimely because of claimants' failure to file within the 10 day limit of GAO rule). In short, Wolverine has failed to make a clear showing that it suffered "irreparable injury" as a result of being excluded from the competitive range.

## III. Wolverine Has Not Demonstrated A Substantial Probability Of Prevailing On The Merits

Wolverine presents three arguments in support of its contention that DSCP acted arbitrarily when it excluded Wolverine from the competitive range. First, Wolverine argues that, under the terms of the Solicitation, DSCP was required to include it within the competitive range because the rating on its technical proposal was [redacted] Motion at 12-14. Second, Wolverine argues that the [redacted] rating for the PDM should have been at least a [redacted] rating because the average of the subfactor ratings was [redacted] Motion at 14-16. And third, Wolverine argues that DSCP was incorrect in finding major defects requiring preventative corrective action with respect to the "manufacturing operations" subfactor of the PDM and also in rating the "experience" subfactor of the "experience/past performance" factor [redacted] instead of [redacted]' and the "delivery" subfactor [redacted]" instead of [redacted] Motion at 16-20. According to Wolverine, if DSCP had properly evaluated the "manufacturing operations" subfactor of the PDM and accorded appropriate scores to the

"experience" and "delivery" subfactors of the "experience/past performance" factor, Wolverine's overall rating would have been higher and there would be "no reasonable basis to support elimination of Wolverine from the competitive range." Motion at 20. As we demonstrate, these arguments are without merit.

## A. The Standard For Reviewing Evaluation Factors And Subfactors

As this Court has noted: "technical rating decisions are the 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess.'" CCL Service Corp. v. United States, 48 Fed. Cl. 113, 119 (2000), quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996). Further, in a negotiated procurement such as this, "[t]he aggrieved party faces a higher burden . . . [because] officials [have] a great deal of discretion." Id.; see Burroughs Corp. v. United States, 617 F.2d 590, 597-98 (1980); Beta Analytics Int'l, Inc. v. United States, 44 Fed. Cl. 131, 137 (1999). Thus, in reviewing a protest concerning a "'decision to eliminate an offeror from the competitive range, [the Court] will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation.'" Id., quoting Beta Analytics, 44 Fed. Cl. at 137 (quoting Beneco Enterprises, Inc., 70 Comp. Gen. 574, 576 (1991)). Under this standard, DSCP's evaluation of Wolverine's proposal manifestly passes muster.

## B. Neither The Solicitation Nor FAR Require All Satisfactory Proposals To Be Included In The Competitive Range

Wolverine contends DSCP indicated in the Solicitation that all technically satisfactory proposals would be included in the competitive range and that Wolverine's proposal was eliminated from the competitive range for "efficiency reasons." Motion at 12. Wolverine

contends it is only possible to eliminate a proposal from the competitive range for "efficiency reasons" if the Solicitation advises offerors that this may happen by incorporating FAR clause 52.215-1(f)(4) in the Solicitation. Id. Wolverine argues that the lack of a reference to this clause in the Solicitation required the agency to include the proposal in the competitive range.

These arguments are baseless. Title 48 C.F.R. § 15.306(c)(1) explicitly empowers the contracting officer to "establish a competitive range comprised of all of the most highly rated proposals . . ." Because of the price divergence between Wolverine's offer and the offers of those within the competitive range, Wolverine's proposal was simply not one of the "most highly rated proposals." The proposal was not eliminated from the competitive range because of "efficiency reasons" but, instead, because it was not a "highly rated proposal;" it had no reasonable chance of receiving an award. While 48 C.F.R. § 15.306(c)(l) explicitly empowers the contracting officer to "further reduce . . . [the range] for purposes of efficiency," this is not what occurred with respect to Wolverine's proposal. Therefore, whether or not the language in section 52.215-1(f)(4) is contained in the Solicitation is irrelevant here.

Further, contrary to Wolverine, the Solicitation advises potential offerors that satisfactory technical proposals may be excluded from the competitive range and does not require such proposals to be included in the competitive range. The Solicitation explicitly provides that the competitive range will be determined upon the basis of evaluations of technical proposals as well as price (business proposals). Appendix at 73 ("Subsequent to the date specified in the solicitation for receipt of proposals, all timely proposals will undergo a technical and a business evaluation . . . The contracting officer will make a competitive range determination based on these evaluations . . . "). Thus, potential offerors are forewarned that the competitive range will

be determined upon the basis of price as well as the technical sufficiency of the proposal. Id. Thus, the Solicitation clearly provides that technically adequate proposals can be excluded from the competitive range if they are not competitive with respect to the technical proficiency or price.

**C. Given The Subfactor Ratings For Manufacturing Operations And Visual, The Initial DSCP Review Properly Rated Wolverine's PDM [redacted]**

Upon the assumption that DSCP was required to accord an overall factor rating as an average of the subfactor ratings, Wolverine contends its PDM warranted at least a [redacted] rating instead of a [redacted] rating. As we discuss below, this issue is now moot because, on the basis of a re-evaluation, Wolverine's PDM, as well as its overall proposal, have now been rated as [redacted] Nevertheless, because Wolverine may apply its "equal weighting" theory to other aspects of its claim, we address the question of whether the Solicitation requires the subfactors to be weighed equally in the evaluation of factors.[6]

Wolverine bases its assumption concerning averaging upon the Solicitation's statement that "The Product Demonstration Model subfactors . . . are of equal importance." Appendix at

---

[redacted]

66; Motion at 14. However, while this language indicates that all the subfactors are of equal importance, it does not indicate that they are to have equal weight in the evaluation of the PDM factor. The Solicitation informs potential offerors that the subfactors, while equally important, are not equally weighted for purposes of rating the overall factor.

It explicitly provides that the PDM will be rated "unsatisfactory" if either of the subfactors of "manufacturing operations" or "visual" are "unsatisfactory," irrespective of the ratings of the other subfactors. Appendix at 67. Thus, the Solicitation reveals that the subfactors are not uniformly weighted even though they are considered of "equal importance." To the contrary, the Solicitation also indicates how the subfactors bear upon the factor's overall rating. Thus, the Solicitation distinguishes "exceptional" and "very good" PDM ratings from "satisfactory" PDM ratings by focusing on whether there are "deficiencies" and, if so, whether the "deficiencies" are "not significant and are very easily correctable during production" (meaning a "very good" rating is appropriate) or ones that "require preventative corrective action in production" (in which event a "satisfactory" rating is applied). Appendix at 70. Therefore, the overall rating for the PDM depends upon the types of deficiencies rather than an average of the subfactor ratings. Id.

[redacted]

[redacted]

D. **With The Exception Of Mismeasuring The Height Of The PDM, DSCP Correctly Evaluated Woverine's Technical Proposal**

[redacted]

[7] See Declaration of Thomas Meehan attached as Exhibit 8.

[redacted]

Wolverine's contention with respect to the components' deficiencies is also inconsistent with the case law. Contrary to Wolverine, the case law clearly provides that "[i]f a patent ambiguity is found in a contract, the contractor has a duty to inquire of the contracting officer the true meaning of the contract before submitting a bid." Newsom v. United States, 676 F.2d 647, 650 (Fed. Cir. 1982); see also Fort Vancouver Plywood Co. v. United States, 860 F.2d 409, 414

(Fed. Cir. 1988) (patent ambiguities are "so glaring as to raise a duty to inquire" by the contractor). The patent ambiguity of the specification appears in the sentence that "[a]ll leather for boot components, with the exception of the eyelet stays and inside counter pocket, shall be cut so as to be used flesh side out." Appendix at 108. The sentence does not indicate whether the offeror has discretion to cut eyelet stays and inside counter pockets with the flesh side out and is thus patently ambiguous. However, rather than seeking a clarification of the sentence from the contracting officer, Wolverine simply designed these components with the flesh side out. Accordingly, Wolverine forfeited its right to have this Court determine the proper application of the provision. Newsom, F. 2d at 650; Fort Vancouver, 860 F. 2d at 414.

Even if the ambiguity is not deemed patent, moreover, Wolverine's interpretation is unreasonable in the context of the specification as a whole. See, e.g., ITT Federal Services Corp. v. United States, 45 Fed. Cl. 174, 188-90 (1999). The interpretation Wolverine accords to the language is not reasonable because DSCP simply does not allow any discretion in the design or manufacture of the boots but, instead, specifies all the dimensions and elements in exacting detail. Appendix at 96-127. With respect to "upper leather," for example, the specification provides that "[t]he leather shall be flesh out drum dyed Desert Sand with color penetrating throughout the thickness of the hide so that the chrome tannage is not visible. The leather for the vamps, inside counter pockets, outside counterpockets and eyelet stays shall conform to MIL-PRF-3122J, Type I, Treatments A and B." Id. at 100. This specifies with exactitude the material requirement for the boots and components.

Likewise, the paragraph of the specification relating to the design of components provides that the leather parts "shall conform to the thickness requirements specified in Table VIII [which

provides dimensions for 'vamps,' 'outside counterpocket,' 'inside counterpocket,' 'front edge stays.' and 'eyelet stays']." Id. at 108. Thus, the specification for the thickness of components is equally exact to the specification for the material to be used in the boots and components. This level of detail with respect to materials and components indicates it is unlikely DCSP intended to accord the manufacturer discretion to decide the cut of the leather for eyelet covers and inside heel pockets. To accept Wolverine's contention, one would have to assume that DSCP would have defined the precise requirements for components in all other material respects but would have left the cut of the leather for two components (eyelet covers and inside heal pockets) to the offeror. This conclusion is unreasonable given the specification's emphasis on detail and uniformity.

[redacted]

Wolverine's contention that the information considered for the "experience/past performance" factor was "essentially the same" for the two solicitations is factually incorrect.

Further, the differences readily explain why the ratings on these subfactors differ for the two solicitations. Under this solicitations, the offeror was required to supply information concerning "the extent of experience producing the same or similar items for a commercial or Government entity within two years preceding the solicitation closing date." Appendix at 61. Contrary to Wolverine, this time frame was not the same for the two solicitations because the Army hot weather boot solicitation closed in August 2006 whereas the Navy deck boot solicitation closed in November 2006. [redacted]

[redacted]

## IV. Wolverine Has Not Demonstrated That The Public Interest Or The Relative Equities Favor An Award Of Preliminary Injunctive Relief

While acknowledging that the Tucker Act, specifically 28 U.S.C. § 1491(b)(3), requires this Court to "give due regard to the interests of national defense and national security in determining whether to interfere with an ongoing procurement," Motion at 22, Wolverine contends the public interest will be advanced if the procurement is stayed because "the public interest is served by enforcing a procurement process that conforms with . . . the solicitation's

evaluation criteria." Motion at 23, quoting Cardinal Maintenance Service, Inc. v. United States, 63 Fed. Cl. 98, 111 (2004). However, as noted in the declaration of the Commander of DSCP, Brigadier General J. Cross, the boots which are subject to the Solicitation are worn by "[a]ctive duty personnel . . . during training and garrison missions . . . [and are] also issued to combat personnel upon deployment." Declaration of Brigader General J. Cross (attached as Exhibit 6) at ¶ 3. Further, "the attributes of the boot afford the solder an item of footwear that will provide support and protection commensurate with training and battle in the desert environment." Id. at ¶ 4. Thus, the boots are vital to the efforts in Iraq and Afghanistan as well as in other areas in which soldiers engage in "training and battle in the desert environment." Id.

Notwithstanding the exigencies of national defense and security, Wolverine contends that the equities balance in its favor because it is likely to lose the financial benefits of the competition in the absence of preliminary injunctive relief and, if such relief is granted, DSCP can still procure the boots in a timely fashion by using justification and approval authority to award emergency contracts to incumbent contractors. While the public interest is served by competitive procurements, it is equally served by insuring that there is a minimum of "excessive judicial infringement upon the agency's discretion" to procure supplies and services in the public interest. Software Testing Solutions, 58 Fed. Cl. at 539, quoting Aero Corp. S.A. v. United States, 38 Fed. Cl. 237, 242 (1997). As this Court has observed, "[e]xcept in the most extraordinary circumstances, judicial infringement on the procurement process in the form of preliminary relief [is] inappropriate, where, as here, the plaintiff . . . waits an inordinate period of time . . . before pressing its claim." Id. The longer a plaintiff waits to challenge a procurement the more difficult it becomes for the agency to satisfy the needs for which the procurement was initiated.

[redacted]

---

[redacted]

[redacted]

Had Wolverine challenged the procurement at the time of the debriefing instead of waiting until one month prior to the beginning of the fourth quarter of the fiscal year (i.e. precisely at the time of the anticipated surge and need to fill back orders), DSCP could have avoided making a final determination of the competitive range until the challenge was resolved. This could have been done expeditiously through an agency or GAO review or timely action in this Court. Any of these proceedings would have avoided the costs of final negotiations with the entities within the competitive range and would have obviated the necessity of reopening these negotiations if Wolverine's current challenge proves successful. Further, if DSCP had been aware of the challenge in February, it could have planned for the possibility of delays in new awards by revising the delivery schedules for various sizes of boots under the then-existing contracts. For example, by seeking to fill sizes on back order earlier, and planning to procure temporary emergency contracts earlier, it could have planned for the fourth quarter emergency. At the present time, however, DSCP lacks these planning options and is now facing substantial back orders and an anticipated surge in demand. Even if it could hold competitions under emergency provisions of the FAR for short term interim contracts, see 48 C.F.R. 6.304, this would take time and DSCP would be unable to take delivery of boots under the interim awards in time for the

fourth quarter surge. Further, it is likely the costs for such short term interim contracts would exceed those under the current solicitation which are for a one year base period and four one year option periods.

In short, preliminary injunctive relief would disrupt DSCP's planning process and would result in a delay of the awards for the supply of hot weather boots needed by Army personnel. Indeed, as noted by Brigadier General Cross: "The Chief of Staff for the Army has required all Active Components, U.S. Army Reserve and Army National Guard to possess one pair of tan combat hot weather boots on or before May 2007." Exhibit 6 at ¶ 1. Even assuming that the public interest in a competitive procurement is harmed in the absence of preliminary injunctive relief, this is outweighed by the public interest in the supply of hot weather Army combat boots to new recruits and soldiers overseas. See, e.g., CW Government Travel, Inc. v. United States, 61 Fed. Cl. 559, 579 (2004) ("With the increased need for military travel due to recent world events, it is in the public interest that the DTS system be deployed to as many travel regions as possible, as quickly as possible"). Further, as this Court has noted in analogous circumstances, "plaintiff's evidence of a flawed procurement process is not so clear as to require the vindication of that interest at the expense of the agency's ability to provide for its mission needs." OAO Corp., 49 Fed. Cl. at 484. Finally, even assuming Wolverine would incur a financial loss in the absence of preliminary injunctive relief, "[t]he financial harms . . . [the agency] would suffer with preliminary relief . . . should be roughly equivalent to plaintiff's financial harms." Id. at 483. Accordingly, Wolverine has failed to carry its burden of persuasion and the motion for preliminary injunctive relief should be denied.

**CONCLUSION**

For these reasons, plaintiff's motion for temporary restraining order and/or preliminary injunction should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/ David A. Levitt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W. 8th Floor
Washington, D.C. 20530
Tel: (202) 307-0309
Fax: (202) 514-7965

May 8, 2007